Argued October 3, affirmed October 23, 1957

MARKS, Executor *v.* SOUTHERN PACIFIC
COMPANY ET AL.
316 P. 2d 523

*Dudley C. Walton* argued the cause for appellant. On the brief were Geddes, Felker, Walton & Richmond, Roseburg.

*Wayne Hilliard,* Portland, argued the cause for respondents. With him on the brief were Koerner, Young, McColloch & Dezendorf, Portland.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and MCALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment which the circuit court entered pursuant to a motion made by the defendants for the award of judgment in their favor notwithstanding the verdict. The action was based upon charges that John E. Marks, of whose estate the plaintiff is executor, was killed through the negligent operation of a train by the defendants. The

verdict was in the sum of $5,000. The defendants-respondents are Southern Pacific Company and Clarence W. Wilson, an engineer in its employ. The motion for entry of judgment notwithstanding the verdict was based in part upon a contention that the record contained no evidence of negligence upon the defendants' part and that it indicated that the decedent was himself guilty of the negligence which resulted in his death. The action was grounded upon the last clear chance doctrine.

The fatality occurred a few minutes after five o'clock in the afternoon of September 6, 1952, when the defendants' train struck a motionless pickup truck of which Marks was the sole occupant. The misfortune occurred upon the tracks of the railroad company at a point where they intersect a country road known as Garden Valley road. The intersection is near Roseburg. Several one-story business structures stand near the intersection. Garden Valley road extends east and west. The Southern Pacific tracks cross it at a right angle. The train was moving north as it approached the crossing. Besides the engine in front, a pusher engine was in the rear. Marks had been driving west when, according to the plaintiff, his truck "stalled" on the track. The intersection is guarded by a wigwag signal which, it is conceded, went into operation as the train approached. It is also conceded that the engine blew its whistle at least twice as it neared the crossing. One of the plaintiff's witnesses testified that the whistle blasts were of the regular crossing type and described them as "two longs and one short."

The complaint alleges:

"* * * That as said John E. Marks approached within a few feet of said railroad cross-

ing, a small wigwag signal commenced to operate and the said John E. Marks attempted to stop said pickup automobile before crossing said track. The said pickup automobile came to rest on said railroad tract in a stalled condition. That thereupon the said John E. Marks tried to start said pickup to remove the said pickup from said track. That at said time and place, as the said John E. Marks was attempting to start said pickup to remove the same from said track, the defendant Clarence W. Wilson was driving and operating a train of the Southern Pacific Company on said railway track at a point approximately one thousand (1,000') feet south of said Garden Valley crossing. That at said time and place defendants did discover the pickup of said John E. Marks stalled on said Garden Valley crossing in peril; that said defendants did then and there negligently and carelessly continue to drive and operate said train as aforesaid into and against the pickup * * *."

The complaint charged negligence as follows: (1) failure to stop after discovery of Marks' peril; (2) failure to avert the collision; (3) operation of the train at a negligent rate of speed; (4) failure to have installed adequate signal devices at the crossing. The answer denied all averments of negligence and charged the deceased with negligence.

The record discloses no deficiency in the signaling device, and contains no suggestion that anything else was needed. It will be noticed that the quoted language says that the signal was in operation before Marks stopped and when the train was 1000 feet away.

The evidence does not indicate why Marks' truck stopped on the track. So far as the record discloses, it was volitional. Although the averment which we quoted says that "thereupon the said John E. Marks tried

to start said pickup to remove the said pickup from said track," the evidence upon that subject is a vacuity.

One of the plaintiff's witnesses, Charles E. Wright, testified that following the accident, defendant Wilson told him that the train approached the crossing at a speed of 25 miles per hour, blew its whistle "and all at once a pickup stalled on the tracks. I set the brakes but couldn't avoid striking the pickup." Another of plaintiff's witnesses testified that Wilson told him that if he had "thrown on the brakes when he first saw the truck in front of him, that he would have buckled his train on account of the pusher engine behind." Jesse L. Perry, another witness for the plaintiff, was proceeding east on Garden Valley road, approaching the tracks, a few moments before the mishap. He had driven that route many times and was well acquainted with the intersection. When he was approximately 150 feet west of the tracks he saw Marks' truck and another car approaching the intersection. The latter car continued on its way and is not involved in this case. According to Perry, "it [the pickup] was coming to a stop at the railroad track." Proceeding with his narrative, he testified that "almost at the same time" he saw the smoke of a train coming from the south as it approached Garden Valley road. By reverting to the averments of the complaint which we have quoted, it will be noted that they allege that when Marks' car stalled on the track, the train was 1,000 feet to his left, that is, to the south. The appellant's (plaintiff's) brief says:

"The evidence shows that the truck of John E. Marks stalled on the crossing when the train of the defendants was some 1000 feet south of the crossing near the Hudson Duncan Warehouse (See testimony of Jesse Perry, Transcript page 25)."

Perry estimated the train's speed as 35 miles per hour. We now quote from his testimony:

"We saw the smoke of the train and looked back at the cars because the truck was still setting there and the other car had went across and we wondered why that guy is waiting for the train, why he is setting there, and, as we came closer to the truck, we noticed that the truck was on the track, so we just watched the train come closer and the truck didn't move until they collided. * * * Yes, we watched; we looked from one to the other. We played a game almost; we looked at one and looked at the other to see if he was going to get out of the way after we discovered he was on the track."

Perry swore that when the train was 75 or 100 feet from the crossing it diminished its speed. Referring to the engineer, he testified:

"He blowed for the crossing. He blowed a couple of whistles in there at about the time he was blowing for the crossing.

"Q Did he do any blowing after that?

"A When he cut his speed, he opened the whistle up."

Referring to the man in the truck and the moment immediately prior to the impact, Perry testified:

"The guy had the door partly opened and one foot on the ground."

Following the accident, Perry spoke to the engineer and was told by him that "he had done all he could do to prevent it" and also that "he thought the guy was crossing."

Gene Perry, a brother of Jesse Perry [the witness whom we have just quoted], was in his brother's vehicle as they approached the crossing. He, too, was a witness for the plaintiff. He saw the smoke of the

approaching train and Marks' automobile come to a stop on the track. We now quote from him:

"As near as I could tell, it would be the truck was stopped and we were talking about it and the train hadn't apparently been given; any reason to slow down. As we approached near we saw the truck on the track and the train still hadn't slowed down and it apparently didn't make any attempt to slow down until about 75 or 100 feet from the crossing."

He likewise estimated the train's speed as 35 miles per hour before it reduced its speed. .

The appellant's (plaintiff's) brief submits the following single assignment of error:

"The court erred in setting aside the verdict and the judgment made and entered in favor of plaintiff and against the defendants, and awarding judgment to defendant notwithstanding the verdict."

The brief says:

"The basic issue for determination by this appeal is: 'Was John E. Marks guilty of contributory negligence as a matter of law for his failure to remove himself from his stalled pickup truck in time to avert his death?' "

The record does not disclose why Marks did not remove himself from his truck before the train struck; nor does it make any intimation as to what he was doing while the train was approaching. It is clear that the train was visible from his position for a distance of at least 1000 feet after his car had stopped upon the track. As we have noted, the wigwag signal was in operation and the locomotive had blown its whistle not less than two times as it drew near. A photograph showing the wigwag signal is before us as an exhibit. The device is of the familiar kind in which a red painted disc moves

back and forth from a crossarm while a bell rings and a red light flashes on and off. Jesse Perry testified that the engine, a coal burner, was "throwing a little more coal than usual" and, therefore, we assume that it was making considerable noise. At any rate, Marks knew that a train was approaching, for the complaint, as we have seen, says: "as said John E. Marks approached within a few feet of said railroad crossing, a small wigwag signal commenced to operate and the said John E. Marks attempted to stop said pickup automobile before crossing said track."

■■■ Both parties cite and rely upon *Emmons v. Southern Pacific Co.*, 97 Or 263, 191 P 333, from which we take the following:

"On the other hand, in the absence of knowledge to the contrary or some fact which ought to arouse his suspicion that this is not true, the man in charge of the train has a right to presume that anyone seen at a public crossing or elsewhere on the track is in possession of all of his senses, and that care for his own safety will induce him to use them, and then to act on the warnings conveyed through them:

\*    \*    \*

"\*    \*    \*    \*    \*

"\*    \*    \* If simultaneously the plaintiff has a chance to escape the injury by exercising ordinary diligence, and does nothing to extricate himself from danger, the doctrine of last clear chance does not apply. Such a situation is one where the negligence of the plaintiff continues in operation to and including the very moment of collision. In other words, it is a distinct instance of contributory negligence. It is settled by the decisions of this court that the rule of last clear chance applies only where the defendant has actual knowledge of the perilous position of the plaintiff:    \*    \*    \*.

"\*    \*    \*    \*    \*

"* * * The true doctrine is that, granting that both parties are negligent as they approach the climax of the transaction, a situation may develop where the defendant on his part arrives at a knowledge and appreciation of the peril of the plaintiff and his inability to extricate himself therefrom, on the one hand, and on the other, that the plaintiff's negligence has ceased to operate as a factor, but remains only as a condition. At this point a new condition supervenes, in which all previous negligence of both parties is laid out of the account, and a new duty, dating only from that moment, arises on the part of the defendant, who is required then, and not until then, under the last clear chance doctrine, to use all of the means he has at hand to avert the injury. The obligation to avoid injury, however, is alike incumbent upon both parties, and if at that time the plaintiff had a chance to escape harm and yet did nothing to accomplish that result, he cannot complain because he himself did not embrace the last clear chance; and further, his own negligence continued to operate to the very point of collision. This rule is thus stated in 20 R. C. L., page 143:

" 'Not only must the defendant have had actual knowledge of the plaintiff's dangerous situation, but he must have been aware also of the plaintiff's unconsciousness of or inability to avert the peril. The plaintiff's right of recovery exists when the defendant, after having discovered his peril, having also reasonable ground to believe him unconscious of danger, or unable to avoid it, might himself, by the exercise of ordinary diligence, have prevented the mischief which followed. It is when the engineer or motorman sees that a person "is apparently placing himself in a position of danger without being aware of the approaching" train or car that "it is plainly his duty to take cognizance of that fact and avoid injury to him if practicable." If, on the other hand, the trainmen see a person on or near the track and there is nothing to indicate that he

is unconscious of danger from the train, no duty devolved upon them to stop. And so where the motorman of an electric car sees a person on the track at a place where the car is plainly visible, he has the right to assume that such person will use his senses and get off the track in time to avoid injury."

■ The legal principles which we quoted from the Emmons decision are not challenged by the plaintiff and, accordingly, we will not resort to other case law. The material quoted from the Emmons decision justified the railroad train crew in assuming that Mark's truck would resume its course and withdraw from the track when its driver was apprised of the approaching train. Plaintiff's witness, Gene Perry, who saw the situation with his own eyes, evidently did not believe, at the outset, that Marks' pickup truck would fail to move out of the way of the on-coming train, for, after he had described the pickup truck standing on the track and had mentioned that his brother commented upon it, he added: "The train had not apparently been given any reason to slow down." The plaintiff's brief says:

"There was a presumption that the engineer was entitled to rely upon the fact that Mr. Marks would get off the track before the train arrived, that he would take care of himself."

That observation is well justified by the Emmons decision.

■ We are aware of nothing which charged defendant Wilson, engineer of the train, with knowledge that Marks would not vacate the track until the whistle's repeated blasts had failed to produce the intended movement.

"If the engineer had applied his brakes or commenced to stop his train when he first saw the
The plaintiff's brief says:

stalled vehicle of John E. Marks on the track while his train was in the vicinity of the Hudson Duncan Company Warehouse he would have stopped the forward motion of the train at a point 100 to 200 feet south of the railroad crossing."

We do not know the basis of that calculation. But, accepting it as warranted, the evidence indicates that when the locomotive was near the Hudson Duncan warehouse, the engineer had no reason for believing that Marks would not withdraw from the track. Near that point the engineer again blew his whistle, and the record warrants a belief that he took note of what was ahead. We think that he had a right to believe that Marks would still exercise his senses and withdraw from the track. He was apprised too late of the fact that Marks did not intend to get off the track. The evidence fails to show that the defendants had a last clear chance of avoiding Marks' injury.

We do not believe that the assignment of error discloses any merit.

The challenged judgment is affirmed.